**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ACORDIA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )        No. 06 C 3857 |
| | ) |
| ANTHEM INSURANCE COMPANIES, INC. | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

Before the court is defendant Anthem Insurance Companies,
Inc.'s ("Anthem") motion for summary judgment pursuant to Fed. R.
Civ. P. 56.  For the reasons explained below, we deny defendant's
motion.

**BACKGROUND**

Prior to July 31, 1997, Acordia, Inc. was a wholly-owned
subsidiary of Anthem.  (Def. Anthem Ins. Co., Inc.'s Stmt. of
Undisputed Material Facts in Support of its Mot. for Summ. J.
(hereinafter "Def. SOF") at ¶ 6.)  At some point prior to that date
a third entity, ACO Acquisition Corp. ("ACO"), was formed to
purchase Acordia.  (Pl. L.R. 56.1(b)(3)(B) Stmt. of Add'l Facts in
Opp'n to Def.'s Mot. for Summ. J. (hereinafter "Pl. SOF") at ¶ 1.)
On July 31, 1997, ACO, Acordia and Anthem entered into a Purchase
Agreement whereby Anthem conveyed Acordia's "Brokerage Operations"
to ACO.  (Def. SOF ¶ 7.) Included in the sale were several of

Acordia's subsidiaries, including Acordia of Illinois, Inc.[1] (Id.)

The Purchase Agreement, which is expressly governed by Indiana law,

contains a lengthy, "heavily negotiated" section concerning the

parties' indemnification obligations. (Def. Mem. in Support of Mot.

for Summ. J. (hereinafter, "Def. Mem.") at 8.)  As the outcome of

Anthem's motion for summary judgment depends upon the proper

interpretation of these provisions, we will discuss them in detail.

In section 10.01(4) Anthem agreed to indemnify Acordia and hold it

harmless "from and against every Claim . . . that arises out of or

in respect of or results from . . . the Special Indemnities, as set

forth in Section 10.05." (See Purchase Agreement, attached as Ex.

1 to Def. Mem.)  Section 10.05, in turn, provides that Anthem shall

> indemnify and hold [Acordia] and the Subsidiaries
> harmless from and against every Loss incurred by
> Purchaser or the Subsidiaries . . . that arises out of or
> in respect of or results from . . . any Legal Proceeding
> . . . instituted or overtly threatened after the Closing
> Date with respect to any Claim arising out of or in
> respect of or resulting from facts or circumstances
> existing at or prior to the Effective Date.

(Id. at § 10.05.)[2]

---

[1] ACO also acquired Acordia—presumably pursuant to a separate purchase agreement. (Pl. Resp. to Def. Stmt. of Material Facts (hereinafter, "Pl. Resp.") at ¶ 6.)  ACO subsequently merged with and into Acordia, the plaintiff in this lawsuit. (Id.)

[2] A "Claim" is defined as a "claim, action, suit, demand, investigation, proceeding, assessment, judgment, order or settlement asserting, overtly threatening or involving or potentially involving a Loss." (Purchase Agreement § 1.01.)  A "Loss" is defined as "loss, damage, liability, obligation, penalty, cost, and legal and other expense (including, without limitation, reasonable attorneys' fees, witnesses' fees, investigation fees, court reports' fees and other out-of-pocket expenses) actually paid or incurred in respect of a Claim (net of any insurance recovery) but excluding internal costs (such as employee compensation and attributed overhead) and interest unless actually assessed and

The Purchase Agreement further provides, however, that Anthem will not be obligated to indemnify Acordia in certain circumstances:

> (1) Anything contained in this Agreement to the contrary notwithstanding, neither Purchaser nor Parent or Seller shall be entitled to indemnification under Sections 7.06, 10.01, 10.02, 11.02 or 11.03 for any Claim in respect of which the party claiming indemnification shall not have given a Claim Notice to Indemnitor on or before the earlier to occur of:
>
> (i) in the case of Third Party Claims, thirty (30) days following the date on which Indemnitee received notice of such Third Party Claim, or, in the case of Direct Claims, thirty (30) days following the date on which Indemnitee became aware of the circumstance or occurrence giving rise to such Claim (*except, in either case, where Indemnitor has not been prejudiced in any material respect by the Indemnitee's failure to deliver notice within such thirty (30) day period*).

(<u>Id.</u> at § 10.04(1)(i) (emphasis added).) The Purchase Agreement defines "Claim Notice" as a notice identifying in "reasonable detail" the nature of the claim, including, among other things, an estimate of the amount of anticipated losses. (<u>Id.</u> at § 1.01.) Section 10.03 provides that no party shall be entitled to indemnification "with respect to matters not specifically identified in a Claim Notice or to file a Claim Notice with respect to matters not known at the time of delivery of such Claim Notice but which might arise in the future." (<u>Id.</u> at § 10.03.) Anthem's obligation to indemnify Acordia is further limited by Section

---

due to a third party." (<u>Id.</u>)

10.04(2), which provides that Anthem is not obligated to pay any amount in indemnification of certain Claims, including the Special Indemnities, "unless the aggregate of such Claims exceeds $2,500,000 (the 'Basket Amount'), and then only to the extent of such excess." (Id. at § 10.04(2)(a).)

In this lawsuit, the parties dispute the adequacy and timeliness of notice provided by Acordia with respect to two lawsuits filed against Acordia of Illinois, Inc. and that company's president, Ralph E. Aulenta. On October 14, 1999 Acordia's Senior Vice President and Chief Human Resources Officer, Jack O'Connor, sent a letter to Michael L. Smith, Anthem's Executive Vice President and CFO (the "O'Connor Letter"). (Def. SOF ¶ 27.) In the letter, O'Connor stated that Acordia had "become aware of certain facts suggesting potential irregularities in the operation of the Schaumburg, Illinois office of Acordia of Illinois, Inc." (See O'Connor Letter, attached as Ex. B to Pl. Resp. to Def. Stmt. of Facts.) Acordia's own investigation had revealed that certain clients had been charged excessive fees over a period of years. (Id.) According to the letter, Acordia had, in response, reported the matter to the United States Attorneys' office and the Illinois Insurance Commissioner. (Id.) The letter goes on to request indemnification pursuant to Section 10.05(1)(v) for any claims arising out of these circumstances, although it notes that "[a]s of this date, there has been no claim by any third party for any

penalties or liabilities." (Id.) O'Connor's letter would seem to demand a response of some kind, but neither party indicates what communications (if any) took place between Acordia and Anthem immediately after O'Connor's letter.

On December 18, 2001, more than two years after Anthem received O'Connor's letter, the Village of Rosemont sued Acordia of Illinois, Inc. and Aulenta in the Circuit Court of Cook County (the "*Rosemont* Lawsuit"). (Def. SOF ¶ 18.) Rosemont's complaint alleged that the defendants had defrauded Rosemont by "misrepresenting the costs of procuring insurance, collecting amounts in excess of the actual insurance premiums due and profiting from the difference." (Id. at ¶ 19.) Shortly after Rosemont filed its complaint, a federal grand jury indicted Aulenta for allegedly using sham transactions to collect excess insurance premiums paid by the Village of Rosemont to Acordia of Illinois and a second entity, ABI. (Pl. Stmt. of Facts ¶ 9.) On November 14, 2002 a second lawsuit was filed against Acordia of Illinois and Aulenta in the Circuit Court of Cook County (the "*Lawndale* Lawsuit"). In that lawsuit, Lawndale Restoration Limited Partnership alleged fraud similar to that alleged in the *Rosemont* Lawsuit. (Def. SOF ¶ 23.)

Acordia did not notify Anthem that these lawsuits had been filed until August 8, 2003, when Robert M. Greco, Acordia's General Counsel, sent a letter to Timothy P. Spears, Anthem's Vice

President of Recovery/Subrogation Services (the "Greco Letter").
(Def. SOF ¶ 47.)  Greco's letter attached the complaints in the
*Rosemont* and *Lawndale* Lawsuits, as well as a copy of Aulenta's
indictment.  (Greco Letter, attached as Ex. B. to Pl. SOF.)
Acordia maintains that the Greco Letter was prompted by its belief,
based in part on the status of settlement negotiations in the
*Rosemont* Lawsuit, that its aggregate liability in the *Rosemont* and
*Lawndale* Lawsuits might exceed the Purchase Agreement's $2,500,000
Basket Amount. (Pl. SOF ¶¶ 20-21.)  With respect to the *Lawndale*
Lawsuit, however, Acordia maintains that relatively little happened
between January 2003, when it was served with the complaint, and
August 2003.  According to Acordia, it had incurred less than
$21,000 in attorneys' fees and other costs related to the Lawndale
Lawsuit, the parties had engaged in "written and paper discovery"
only, and no discovery deadlines had passed.  (Id. at ¶¶ 15, 17-
18.)  Moreover, Acordia maintains that the "key witnesses" and
other evidence in the Lawndale action were still available to
Anthem on August 8, 2003.[3] (Id. at ¶ 29.)

Approximately two months later, on November 17, 2003, the
parties to the *Rosemont* Lawsuit settled their dispute for
$1,282,112.00.  (Def. SOF ¶ 20.)  In connection with that lawsuit,
Acordia incurred $142,438.61 in attorneys' fees, costs and other

---

[3] As discussed later in this opinion, neither party provides any details
concerning the status of the *Rosemont* Lawsuit in August 2003.

expenses.  (Id. at ¶ 22.)  Aulenta, for his part, was ordered to pay Acordia $288,670.00 as restitution, of which Acordia has received $119,460.95.  (Id. at ¶ 21.)  Anthem did not respond to Mr. Greco's letter before the *Rosemont* Lawsuit was settled, and would not do so until January 2004.  (Pl. SOF ¶ 23.)  At that time, Mr. Greco and Mr. Spears met to discuss Anthem's indemnification obligations, if any.  (Id. at ¶ 24.)  According to Acordia, in early January 2004 Anthem (whether through Mr. Spears or otherwise is unclear) denied that it had any duty to indemnify Acordia for losses arising from the *Lawndale* Lawsuit.  (Id. at ¶ 25.)  Anthem's purported reason for denying indemnification, according to Acordia, was that Acordia had failed to provide timely and adequate Claim Notice and that Acordia's losses had not yet exceeded the $2.5 million Basket Amount.[4]  (Id. at ¶ 26.)  Several months later, Acordia provided further information concerning the *Lawndale* Lawsuit, solicited Anthem's input on the case's progress, and invited Anthem to participate in settlement negotiations.  (Id. at ¶ 27.)  Anthem declined, maintaining that it was not obligated to indemnify Acordia.  (Def. Resp. to Pl. Stmt. of Facts (hereinafter "Def. Resp.") at ¶ 28.)  The parties to the *Lawndale* Lawsuit settled their dispute on April 2, 2007 for $2,500,000.00.  (Def. SOF ¶ 25.)  Acordia incurred $353,225.70 in attorneys' fees, costs

---

[4]/  Anthem responds only that it did not have any "written communication" with Acordia regarding the Lawndale Lawsuit until March 1, 2005. (Def. Resp. to Pl. Stmt. of Facts ¶¶ 25-26.)

and other expenses in connection with the litigation.  (Id. at ¶ 26.)

In this case, Acordia seeks an order declaring that Anthem is obligated to indemnify Acordia from any losses in excess of $2,500,000 arising out of the *Rosemont* and *Lawndale* Lawsuits. Anthem has moved for summary judgment on the ground that Acordia failed to provide adequate and timely notice of these lawsuits, thereby absolving Anthem of any obligation to indemnify Acordia.

## DISCUSSION

### A.  Legal Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999).  "Summary judgment should be denied if the dispute is 'genuine':  'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court will enter summary

judgment against a party who does not "come forward with evidence
that would reasonably permit the finder of fact to find in [its]
favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569
(7th Cir. 1995).

**B.    Proper Application of the "Basket Amount"**

The parties dispute the proper application of the Basket
Amount, although neither party supports its position with reference
to the specific provisions of the Purchase Agreement.    In
interpreting the Purchase Agreement, we will give individual
contact terms their plain meaning, P.C. Management, Inc. v. Page
Two, Inc., 573 N.E.2d 434, 439 (Ind. App. 1991), and interpret
those terms within the context of the entire contract. Reuille v.
E.E. Brandenberger Const., Inc., 873 N.E.2d 116, 119 (Ind. App.
2007) ("The contract is to be read as a whole when trying to
ascertain the intent of the parties."). Acordia maintains that any
delay in providing notice of the *Rosemont* Lawsuit is irrelevant
because it is not seeking indemnification for that claim.    (Pl.
Opp'n at 11 n.9.)    Rather, losses attributable to that lawsuit
apply to the $2.5 million Basket Amount, with the remaining portion
of the Basket Amount to be applied to losses attributable to
*Lawndale*.    (Id.)[5]    Anthem argues that by including the *Rosemont*

---

[5]/    In its first amended complaint, Acordia requests a declaration that
Anthem "is obligated to indemnify and hold Acordia harmless from and against any
losses in excess of $2,500,000 arising out of the Rosemont and Lawndale Lawsuit,
pursuant to Section 10.05(1)(v)(b) of the Purchase Agreement." (Pl. Compl. at
10.)  Although not strictly at odds with the requested declaration, Acordia's
current argument is at least a new wrinkle.

Lawsuit in the Basket Amount, "Acordia is seeking a declaration as to whether Anthem is obligated to provide indemnity for damages arising from that action." (Def. Resp. ¶ 7.)

Section 10.04(2) provides that Anthem "shall not have any obligation to pay any amount in indemnification . . . with respect to the matters described in Section 10.05(1)(ii) below, unless the aggregate of such Claims exceeds $2,500,000 (the 'Basket Amount'), and then only to the extent of such excess."[6] "Claims" are defined generically to include any lawsuit or similar proceeding potentially involving a loss. But not every "Claim" asserted against Acordia applies towards the Basket Amount. Rather, only specific Claims for which Acordia is otherwise entitled to indemnification (i.e., breach of certain representations and warranties and Section 10.05(1) "Special Indemnities") apply. Section 10.05(1)(v)—which encompasses the *Lawndale* and *Rosemont* Lawsuits—is, in turn, subject to the notice requirements in Section 10.04(1). Specifically, Anthem is not obligated to indemnify Acordia for the "Special Indemnitees"—which are also "Third Party Claims" under Section 10.04(1)—unless it receives a Claim Notice of such claims within the period specified in Section 10.04(1). In effect, Acordia asks the court to examine Sections 10.04(1) and 10.05(1) in isolation to determine first whether a Claim

---

[6]   Section 10.05 was later amended to add additional subsections under Section 10.05(1).  The relevant subsection, pertaining to losses arising from pre-sale circumstances, is now 10.05(1)(v), not (ii).

constitutes a "Special Indemnity," and second whether it exceeds the Basket Amount. The other provisions of the contact do not, under Acordia's analysis, apply. We find no basis in the contract for such a blinkered interpretation. Whether Acordia is entitled to reduce the Basket Amount with losses from the *Rosemont* Lawsuit depends upon whether it is entitled to indemnification for those losses, which in turn depends (in part) on whether it provided timely notice of that lawsuit.

This interpretation is bolstered by the reference in Section 10.05(1) to "election pursuant to Section 10.03(1)." Anthem may, pursuant to Section 10.03(1), elect to defend a claim within thirty days after receiving a Claim Notice. Anthem's right to defend Acordia, which does not depend on whether the Basket Amount has been exceeded, is worthless if it does not receive Claim Notice of the Legal Proceeding at issue. Indeed, whether losses attributable to a particular Third Party Claim will exceed the Basket Amount is pure speculation when the Claim is first asserted. Proper, timely Claim Notice gives Anthem an informed basis to decide whether to exercise its right defend the Claim. Accordingly, we will proceed to determine whether Acordia's notice was proper with respect to both lawsuits.

## C.    **The Timeliness and Adequacy of Notice**

We conclude that Acordia failed to provide timely notice of the *Rosemont* and *Lawndale* Lawsuits. First, O'Connor's letter was

insufficient to satisfy the Purchase Agreement's notice requirements. At the time the letter was sent, no third-party claim had been made with respect to Aulenta's activities. (See O'Connor Letter at 1 ("As of this date, there has been no claim by any third party for any penalties or liabilities.").) Indeed, the *Rosemont* and *Lawndale* complaints were not filed until several years later. Section 10.03 expressly prohibits this type of prospective notice. (See Purchase Agreement § 10.03(3) ("[N]either Purchaser nor Parent nor Seller shall be entitled to . . . file a Claim Notice with respect to matters not known at the time of delivery of such Claim Notice but which might arise in the future.").) Whereas O'Connor's letter arrived too soon, Greco's letter arrived too late. That letter was sent approximately twenty months after the *Rosemont* Lawsuit was filed and nine months after the *Lawndale* Lawsuit was filed. Acordia maintains that it provided notice in August 2003 because it only then became apparent that the aggregate liability for the two lawsuits would exceed the Basket Amount. The Purchase Agreement provides that the thirty-day window to deliver notice of Third Party Claims is triggered when the indemnitee receives notice of those claims. (See Purchase Agreement § 10.04(1)(i).) The likelihood that a Third Party Claim will or will not exceed the Basket Amount is irrelevant.

By its terms, Section 10.04(1)(i) requires us to proceed to determine whether Anthem has been prejudiced by Acordia's untimely

notice.  Anthem argues, however, that we can bypass the prejudice analysis if we conclude that Acordia's Claim Notice was "inadequate" as opposed to merely "untimely."  O'Connor's letter failed to satisfy any of the Purchase Agreement's notice requirements.  By contrast, the Greco Letter, which attached the *Rosemont* and *Lawndale* complaints, effectively provided all the information required by the "Claim Notice" definition.  It was, therefore, "adequate" to provide notice of the claims for which Acordia sought indemnification.  The only challenge that Anthem makes to the August 2003 notice, indeed the only challenge it could make, is that it was sent too late. (Reply at 2.)  Accordingly, we proceed to discuss whether Anthem was prejudiced by the Acordia's untimely notice.

## D.  **Prejudice Arising from Acordia's Untimely Notice**

Anthem relies on Indiana cases construing insurance policies for the proposition that prejudice may be presumed from the mere fact of delay.  See, e.g., Miller v. Dilts, 463 N.E.2d 257, 265 (Ind. 1984).  Under the framework described by the Indiana Supreme Court in Miller, an insured may rebut the presumption of prejudice by providing "some evidence" that the insurer was not prejudiced. Id. at 265-66.  At that point, "the question becomes one for the trier of fact to determine whether any prejudice actually existed." Id.  Anthem also relies on Paint Shuttle, Inc. v. Continental Cas. Co., 733 N.E.2d 513 (Ind. App. 2000), in which the court noted that

"[n]otice is a term of art within the insurance context . . . ." Id. at 520-21. Proper notice under an insurance policy requires that the notice be "(1) timely as proscribed by the language of the insurance policy; and (2) 'true' in the sense that the insured allows the insurer to exercise its rights of investigation and defense of a claim under the policy." Id. at 521. The Paint Shuttle court concluded that the notice in that case was deficient in both respects: not only was it untimely, but the insured also "undertook the investigation and defense of the claim in contravention of [the insurance company's] rights under the policy." Id. Although Anthem does not make this argument explicitly, much the same could be said in this case: Acordia's notice was untimely and it undertook to defend the case before eventually seeking indemnification.

None of the cases that Anthem cites apply Miller's presumption of prejudice outside of the insurance-policy context. Acordia points out that other jurisdictions have treated non-insurance contracts differently than insurance policies. Applying New York law, the Court in Smurfit Newsprint Corp. v. Southeast Paper Mfg. Co., 368 F.3d 944 (7th Cir. 2004) held that the New York Court of Appeals would not apply New York's "no prejudice" rule outside the insurance context. Id. at 954. That rule provides that "where the insured has not complied with notice-of-claim provisions, an insurer need not demonstrate prejudice before it may refuse to

- 15 -

perform its insurance obligations." Id. at 952. The Court

concluded that the policy rationales supporting the no-prejudice

rule, including the numerous claims that insurers must contend with

as well as the need to set reserves, "have minimal application

outside the insurance context." Id. at 953. Acordia also relies

on Trex Co., Inc. v. Exxonmobil Oil Corp., 234 F.Supp.2d 572 (E.D.

Va. 2002), which dealt with the indemnification clause of an asset

purchase agreement. That clause provided that "lack of notice

absolves the indemnifying party of its obligations only 'to the

extent that such delay actually prejudiced its ability to defend or

contest the matter.'" Id. at 579. The plaintiff received notice of

a claim approximately two years before it provided notice to the

defendant/indemnitor. Id. The court noted, however, that in the

interim the plaintiff "did nothing more than write letters denying

infringement and offer [the third-party claimant] a nominal

settlement." Id. at 579-580. In light of these facts, the court

concluded that the defendant had failed to show "'actual prejudice'

caused by [plaintiff's] untimely notice, and cannot rely on

[plaintiff's] late notice to evade its duty to indemnify." Id. at

580.[7]

_____

[7]/ Although not addressed by Acordia or by the court in Trex, it appears
that a Virginia court would not require an insurer to show prejudice (at least
in the absence of an express actual-prejudice clause) under similar facts
involving an insurance policy. See State Farm Fire and Cas. Co. v. Walton, 423
S.E.2d 188, 192 (Va. 1992) (no showing of prejudice necessary based upon two-year
delay in providing notice).

We need not decide in the abstract whether the Indiana Supreme Court would presume prejudice in a case involving the indemnification provisions of a purchase agreement. In this case, Acordia and Anthem negotiated an express prejudice requirement. Under the Purchase Agreement, late notice excuses an indemnitor's obligation to indemnify except "where Indemnitor has not been prejudiced in any material respect by the Indemnitee's failure to deliver notice within [the] thirty (30) day period." So, while Indiana courts construing insurance policies have concluded that the mere passage of time is sufficient to presume prejudice, Acordia and Anthem negotiated a different standard. Applying that standard, Acordia argues, with respect to *Lawndale* at least, that Anthem's interests were largely unaffected by the late notice. No depositions had been taken, no discovery deadlines had passed, and the evidence—consisting largely of paper records—was as fresh in August 2003 as it had been in January 2003. Anthem, for its part, argues that Acordia's late notice prevented it from exploring opportunities to negotiate an earlier, more favorable settlement and to direct discovery from the outset of the case. There is, therefore, a material factual dispute as to whether Anthem was prejudiced in a "material respect."

The longer notice is delayed the greater the likelihood that important opportunities to affect the outcome of the case will be lost. Acordia's notice with respect to the *Rosemont* Lawsuit was

delivered approximately twenty months after that lawsuit was filed. Nevertheless, whether Anthem was materially prejudiced depends upon the particular facts and circumstances of the underlying lawsuit. The parties have provided very few details concerning the status of the *Rosemont* Lawsuit: we know when Acordia was served with the complaint (<u>Id.</u> at ¶ 31), and we know when the lawsuit was settled. (Def. SOF ¶ 22.) With so little information about the case, we cannot conclude that Anthem was materially prejudiced as a matter of law.

## <u>CONCLUSION</u>

Defendant's Motion to for Summary Judgment (34) is denied. The case is set for status on January 16, 2008 at 11:00 a.m.


DATE:      December 14, 2007


ENTER:     _____

           John F. Grady, United States District Judge